IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2010

**TERRENCE WOODS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-03561    John P. Colton, Jr., Judge**

_____

**No. W2009-02060-CCA-R3-PC  - Filed September 17, 2010**

_____

The Petitioner, Terrence Woods, appeals from the Shelby County Criminal Court's denial of post-conviction relief from his guilty plea to first degree premeditated murder and his life sentence.  In his appeal, the Petitioner argues that he received ineffective assistance of counsel because his trial attorneys failed to request an independent mental health evaluation to determine if mental health defenses were available. He also contends that he was unable to make a knowing, voluntary, and intelligent decision to enter his guilty plea because of trial counsels' failure to perform this independent mental evaluation.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Jeff Woods, Memphis, Tennessee for the Defendant-Appellant, Terrence Woods.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephanie Z. Johnson, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Guilty Plea Hearing.**  At the guilty plea hearing on February 15, 2006, the State summarized the facts supporting the Petitioner's guilty plea:

Your Honor, this occurred on February 24th [sic] of 2005. [The Petitioner] went to the home of the victims and fired two shots one of which killed a child in the home.  He was at one time employed as a security guard

at the same company as a Mrs. Franklin. They had a friendship although not a romantic relationship. He purchased some items for her which she accepted, and he was apparently hoping to develop their relationship. She apparently was not.

And on February the 24th [sic], 2005, about 7:55 p.m., he went to the home where she lived and waited in his car just down the street. She and the gentleman that she resided with came home that evening. They noticed the car parked there. I believe she even recognized Mr. Woods's car. They did not think anything of it at the time. She had received a note from him earlier. It was placed on her vehicle stating that he just wanted to talk to her. She did not return that call, and she thought he might be following up on that.

When she got home, she heard a knock at the door. She asked the gentlemen of the house to open the door. He did. When he opened the door, Mr. Woods fired one shot into the house into the living room where everybody was standing and that particular bullet did not cause any fatal injuries.

However, he then pushed his way into the residence, pushed the man of the house out of the way, [and] fired a second bullet. That bullet grazed Mrs. Franklin's sister and then struck her sister's child, who is Jeremy Johnson, in the chest. There were also several other people present in the house at that time. They were not injured.

After the defendant fled, the child appeared to be okay. They took the child to the bathroom to see if there were any injuries and shortly thereafter they discovered the wound to the chest, and I believe the child was pronounced dead at the home.

This did occur here in Shelby County.

The trial court explained the terms of the plea agreement and extensively questioned the Petitioner before accepting his plea of guilty to first degree murder. During the court's examination, the Petitioner stated that he was satisfied with both trial counsel and did not have any criticisms of them. He said that he was aware that his attorneys had two investigators working on his case. The Petitioner said that he knew that he had the right to a jury trial where he could testify and subpoena his own witnesses but was waiving this right to enter his guilty plea. He said that he knew he was facing a sentence of either death by lethal injection or a life sentence with or without parole had he proceeded to trial, and he was choosing to accept the life sentence with the possibility of parole in his plea agreement. The

trial court accepted the Petitioner's guilty plea to first degree premeditated murder and sentenced him pursuant to the terms of the plea agreement.

**Post-Conviction Hearing.** On April 25, 2006, the Petitioner filed a pro se post-conviction petition alleging that his plea was involuntary and unknowing, that trial counsel coerced him into pleading guilty, and that trial counsel rendered ineffective assistance by failing to conduct a mental health evaluation other than the one declaring him to be competent. On May 5, 2006, the Petitioner filed a pro se amended petition for post-conviction relief, wherein he alleged that he wrote trial counsel the day after he entered his plea informing him that he wished to withdraw his guilty plea and that his mother contacted trial counsel three days after he entered his plea and explained that he did not want to enter his plea. Following the appointment of private counsel, the Petitioner filed a second amended petition for post-conviction relief on August 29, 2008, alleging that both trial counsel were ineffective in failing to investigate his case, to investigate his mental health issues, to gather relevant evidence, to discuss applicable defenses, to address discovery issues, and to advise him of the consequences of entering a plea of guilt. Moreover, he alleged that trial counsel coerced him to enter his guilty plea and that his plea was involuntary and unknowing.

At the post-conviction hearing on June 4, 2009, the Petitioner testified that he first filed a post-conviction petition alleging that both trial counsel were ineffective approximately three months after entry of his guilty plea to first degree premeditated murder. He acknowledged that he entered a guilty plea to first degree murder in exchange for a life sentence with the possibility of parole. He also admitted that he was originally charged in a five count indictment which included one count of first degree premeditated murder regarding the child victim, one count of felony murder regarding the child victim, two counts of criminal attempt first degree murder regarding two adult victims, and one count of aggravated burglary. The Petitioner asserted that trial counsel did not talk to him about possible defenses to the charges against him. He acknowledged that one investigator, Rachel Geyser, came to talk to him one time while he was in jail and informed him that she had talked to the victim's family. The Petitioner admitted that he had told trial counsel that he wanted to get an negotiated deal on his charges. He said that his trial attorneys talked to him about the State offering him a plea agreement of life with the possibility of parole in exchange for a guilty plea to first degree murder. The Petitioner said that although he initially believed this plea agreement was acceptable, he realized just after he entered his guilty plea on February 15, 2006, that the plea agreement was not in his best interest.

The Petitioner said that he did not remember either one of his trial attorneys giving him an IQ test prior to entry of his guilty plea. He claimed that trial counsel did not explain the guilty plea paperwork to him prior to entry of his plea and that he did not read the guilty

plea paperwork before signing it. The Petitioner admitted that he had told the court that he had voluntarily entered his guilty plea at the hearing and understood at the time that the State would have sought the death penalty if he had proceeded to trial. He also admitted telling the court that no one had promised him anything or threatened him in order to get him to plead guilty. However, he claimed that he said these things on the record at the guilty plea hearing because he was "kind of confused . . . when [he] signed the [guilty plea] papers." The Petitioner said that he was "[c]oerced" into entering his guilty plea by trial counsel. He claimed that he wanted to go to trial prior to entering his guilty plea. The Petitioner said that he told one of his trial attorneys that he wanted to try his case sometime prior to entering his guilty plea, but he could not recall the exact date. He said that when he told trial counsel that he wanted to go to trial, trial counsel responded by informing him that it would be in his best interest to enter a plea to a life sentence with the possibility of parole because he was facing the possibility of the death penalty at trial. The Petitioner said that trial counsel's statements regarding the death penalty made him decide to enter a guilty plea. He acknowledged that he understood that he was entering a guilty plea in exchange for spending life in prison with the possibility of parole. He said that immediately after entering his guilty plea, he mailed a letter to one of his trial attorneys informing him that he wanted to withdraw his guilty plea. He claimed he never got a response from trial counsel regarding his letter.

The Petitioner said that he filed his post-conviction petition around three and a half months after he entered his guilty plea. He said that he was not on any medication at the time of his guilty plea. He also said that he was not under the treatment of a psychologist or psychiatrist at the time of entry of his plea and had never been under the treatment of any mental health professional.

On cross-examination, the Petitioner admitted that although he had asked trial counsel to get a plea offer from the State, he actually wanted an offer of less than life with the possibility of parole. He acknowledged that trial counsel told him that the State was not going to give him an offer of less than a life sentence with the possibility of parole because of the facts of his case. The Petitioner asserted that his trial attorneys did not get him the best deal that they could have from the State. However, he acknowledged that at the time that he entered his plea, he believed that he was getting the best possible plea agreement.

Following entry of the guilty plea transcript into evidence, the Petitioner said that his statement at the guilty plea hearing that he had thoroughly discussed the facts of his case with trial counsel was not the truth. However, he claimed that he was telling the truth when he stated at the hearing that trial counsel had shown him the evidence and the witnesses against him. The Petitioner also acknowledged that he had told the trial court during the guilty plea hearing that there was nothing that he needed to talk to trial counsel about and that there was nothing else that he wished to say before entry of his plea. He further admitted that he had

stated that he was satisfied with trial counsel. Although the Petitioner stated at the guilty plea hearing that trial counsel discussed mitigation with him, he said that his response was also not the truth. The Petitioner said that although the transcript from the guilty plea hearing showed that he acknowledged talking to two investigators about his case, he claimed that he only remembered talking to one investigator. He also claimed that his statement that he was "pretty much" satisfied with trial counsel and that he had no criticisms of them was not the truth. The Petitioner said that he did not recall stating at the hearing that he was pleading guilty because he knew what the outcome would be. He also said that he did not recall stating that he was aware he could have had a jury trial where he could testify and subpoena his own witnesses. The Petitioner acknowledged that he was not taking medication or drugs at the time he entered his plea that would have affected his ability to remember what happened. However, he said he was aware at the time he entered his plea that he was receiving a life sentence with the possibility of parole rather than a life sentence without parole. He also admitted that he wanted to accept the plea agreement to a life sentence with the possibility of parole at the time he entered his plea. The Petitioner acknowledged that he had killed a six-year-old child in the presence of several witnesses when he was trying to kill someone else. He also admitted that he intentionally waited outside Ms. Franklin's house and then pulled the trigger of his gun in an attempt to kill her. Finally, he admitted that he did not like his sentence, even though he chose to accept the State's offer of a life sentence with the possibility of parole.

Trial counsel testified that he only practiced in the area of criminal defense and had been a criminal defense attorney since 1997. He said that he represented the Petitioner in his capital case. Trial counsel said he had worked on three or four capital cases before working on the Petitioner's case. Of these prior capital cases, one resulted in a mistrial and one proceeded to trial where the defendant was convicted of a lesser included offense.

Trial counsel said that this case was unusual because the Petitioner had no prior criminal history. He said that the Petitioner was charged in a multi-count indictment but entered a plea of guilt to the charge involving the death of the six-year-old child. He said that in addition to the child that was killed, others were also hit with bullets. Trial counsel said that the discovery from the State seemed to be complete and included several witness statements. Trial counsel provided his assessment of the case against the Petitioner:

> The evidence against [the Petitioner] was overwhelming. When the State announced that they would seek the death penalty, I thought that [the Petitioner] stood a very good chance of certainly being convicted as charged and receiving the death penalty. And because of that I asked [co-counsel] to help me – I thought and I still think now that he's a fine lawyer, and that's why I asked him to help me.

Trial counsel said that he believed co-counsel's participation in this case was beneficial both to him and to the Petitioner. He met with the Petitioner and informed him that the State was seeking the death penalty and gave him a copy of the discovery from the State. He also reviewed the discovery with him. In addition, trial counsel said that investigators had been appointed to help the Petitioner avoid the death penalty and to assist with the Petitioner's case, and these investigators met with the Petitioner and reviewed the discovery with him. These investigators shared the information they learned from their investigation with him and with the Petitioner. In addition, trial counsel said that he and co-counsel shared the information that they received from the investigators with the Petitioner. Trial counsel said that the Petitioner "was unhappy that he was facing a first degree murder offen[s]e and he did not want to wind up on death row." The Petitioner also "agreed with us that the strength of the case against him was overwhelming" which was "why he decided to accept responsibility for his conduct." Trial counsel said that he and co-counsel talked to the State about a plea agreement, arguing that the Petitioner had no prior criminal record and was "a very misguided young man who had made a terrible mistake that resulted in the death of a child." Trial counsel said that fairly early in the case, he and co-counsel had a mental evaluation done of the Petitioner, which showed that he was competent. Both trial counsel then informed the Petitioner of what they believed would happen at trial:

> We told [the Petitioner] that if the case proceeded to trial, guilt and innocence was not an issue. That he would be convicted as charged of first degree murder. Upon conviction of first degree murder, the question would be whether he would receive life, life without parole, or death. Should he not receive death, at a separate sentencing hearing, it would be likely that the attempted murder conviction and aggravated burglary convictions would be consecutive to the life sentence or life without parole sentence. Given the facts against us, and that life in prison would be the best result, we asked the State if they would consider that settlement in exchange for a guilty plea, and they did.

After discussing this with their client, trial counsel said that the Petitioner acknowledged that he would be convicted of the first degree murder charge. He further said that the Petitioner "wanted to plead guilty" at the time that he entered his plea. Trial counsel stated that the Petitioner asked "over and over again whether there was any chance of conviction of a lesser included offense[,]" and trial counsel and co-counsel told him that there was no possibility of that happening in this case. Trial counsel also said that Petitioner asked if he could serve the life sentence at twenty percent, but he and co-counsel informed him that he would have to serve fifty-one full years in prison. Both attorneys talked to the Petitioner about pleading guilty two or three weeks before he entered his plea and during this period of time the Petitioner eventually accepted responsibility for his actions. Trial counsel said that he and

co-counsel did not coerce the Petitioner into pleading guilty. He said, "We told him that he was entitled to a trial and at a trial by jury he would be convicted of first degree murder. And that same jury could possibly sentence him to death." Trial counsel stated that there was nothing that he could have done differently to obtain a sentence less than life with the possibility of parole.

On cross examination, trial counsel said that he remembered reviewing the discovery with him. Trial counsel said that he asked the trial court to appoint investigators to help with the case, and two of their investigators were assigned to the mitigation part of the case, and two or three investigators were assigned to the guilt innocence part of the case. The investigators working the mitigation aspect of the case worked on providing reasons not to impose the death penalty and spoke with the Petitioner's family, his friends, his teachers, his employers, and also obtained school and employment records. Trial counsel stated that these records did not show that the Petitioner had any mental health issues. He also said that the investigators looked into the possibility of mental health issues for the Petitioner but found nothing. Trial counsel noted that the Petitioner had no criminal history, was a high school graduate, and had a consistent employment history, none of which indicated that he had any mental health issues.

Trial counsel asked the trial court for a mental evaluation of the Petitioner, which showed that the Petitioner was competent. He said that he did not ask that an independent expert give the Petitioner a mental health evaluation because there were no mental issues present in the case. Trial counsel said that he met with the Petitioner approximately seven times aside from court appearances and that those meetings often lasted around thirty minutes. He recalled the Petitioner wanting to go to trial until January 2006, when he seemed to come to terms with his situation. He also remembered the Petitioner asking him to get him the best deal he could. Trial counsel said that the Petitioner was told of the offer from the State within days of receiving it. The Petitioner then considered the offer for several days before entering his guilty plea at a regularly scheduled court date. Trial counsel said that he never received a letter from the Petitioner informing him that he wished to withdraw his guilty plea; however, he said that he did receive a telephone call from the Petitioner's mother in late summer 2006, which was three to five months after the Petitioner entered his guilty plea. On redirect examination, trial counsel stated that if the Petitioner had insisted on proceeding to trial, he and co-counsel would have represented him throughout trial.

Co-counsel testified that his primary area of practice was criminal defense and that he had been defense attorney since 1991. He stated that prior to his representation of the Petitioner, he had handled over three dozen capital cases, twenty of which he had tried. Co-counsel said that of the capital cases that he tried, most of his clients were convicted of lesser included offenses. He stated that he began representing the Petitioner at the request

of trial counsel when they were working together on another case. Co-counsel said that he had been representing the Petitioner for less than a year when the Petitioner entered his guilty plea. He also said that the State had given him and trial counsel open file discovery in the Petitioner's case. Co-counsel gave his assessment of the Petitioner's case:

> It was overwhelming. It was – this case, and I actually felt bad for my client. This was one of the few cases, a murder case, where there really – there just absolutely wasn't a defense we could find. . . . There just wasn't a defense to this, the way the evidence happened and with the witnesses . . . it was almost a textbook law school question on premeditation.

He stated that the Petitioner had no juvenile record or criminal history as an adult. In addition, the Petitioner had a good school record, good work history, and no mental health history. Co-counsel stated that "the best possible result [the Petitioner could] have gotten . . . in trial, is what he ended up pleading to." He said that he was unsure that the Petitioner would have received the death penalty at trial because he did not have a prior record, but he believed that the jury probably would have given him a sentence of life without parole, which would have been consecutive to some of his other sentences on the other counts of the indictment. He said that the Petitioner "was often looking for an answer different than what we were telling him. . . . And although it was a hard answer, there wasn't any other answer [in this case]." Co-counsel said that he would have been willing to try this case and that he had tried a similar case where there was no defense; however, he asserted that it was the Petitioner's decision not to proceed to trial. He also stated that originally the Petitioner wanted to try the case but when he realized that there were no defenses available to him, he began to want a plea agreement.

Co-counsel said that he and trial counsel considered whether this offense could be presented to the jury as a crime of passion:

> We did discuss [that strategy with the Petitioner]. . . . And that certainly would have been something that we conceivably could have attempted to argue. However, the fact [that] there were that many shots fired. The fact that there was a seven[-]year[-]old boy that was killed, I – that just wouldn't have worked. If it had been a different situation, if the two of them had been in an argument in a bar and he had shot and killed the person he was intending to kill, that might have been a different story, but he killed the wrong person.

He said that although the Petitioner did not like the sentence of life with parole that he was offered, he considered it for several days before voluntarily making the decision to accept it.

On cross examination, co-counsel stated that he met with the Petitioner on all of his court dates and also met with him between five and ten times in jail. He said that the Petitioner was given the discovery, and then he and trial counsel discussed the discovery with him. He also reviewed the guilt and innocence and the mitigation team's findings on the Petitioner's case. Co-counsel said that although there was a competency evaluation done, he and trial counsel did not ask for a forensic psychologist to evaluate the Petitioner because there was no history of mental illness for him or any of his family, and there were no mental health issues in any of his records. Co-counsel said the Petitioner "seemed like a pretty normal person." When asked why he did not get a second opinion from an independent doctor outside of the mental health center, he said that had the matter proceeded to trial, he and trial counsel probably would have gotten a second opinion regarding competency. However, he stated that he did not believe that the Petitioner had any mental health issues that would have aided him at trial. Co-counsel said that he informed the Petitioner that he could not tell him what would happen at trial. He said he told the Petitioner that he believed that a jury would convict him because he had no available defenses but that he did not believe that he would receive the death penalty and would instead receive a sentence of life without parole. He also told the Petitioner that the offer of life with the possibility of parole would allow him "to get out of prison [during his] natural life." He said that he did not recall trial counsel telling him that he would get the death penalty if he proceeded to trial. Co-counsel said that he "probably told [the Petitioner] a jury would have the option of second degree murder and manslaughter" but he did not believe that a jury would ever get to the lesser included offenses in this case. He said this was not "a situation where [the Petitioner] wanted to go to trial and we beat him or coerced him into pleading guilty."

Regarding the alleged letter that the Petitioner sent to trial counsel addressing his decision to withdraw his guilty plea, co-counsel said, "I don't have any recollection of that. I'm not saying I didn't at one time, but I don't have any independent recollection of that at all. Sorry." Regarding whether he had received any telephone calls from the Petitioner or his family regarding his decision to withdraw his plea, co-counsel stated:

I don't believe I did. I think [trial counsel] told me at one point when I saw him over here at [the courthouse] that he had been contacted by the family, at some point, and it was well past any date that anything possibly could have been filed to keep it active in these courts.

On September 16, 2009, the court entered an order denying the Petitioner's request for post-conviction relief. The Petitioner then filed a timely notice of appeal.

## ANALYSIS

The Petitioner contends that his trial attorneys were ineffective in failing to present expert, psychiatric testimony showing that the Petitioner was unable to form the requisite culpable mental state for the charged offenses. He acknowledges that a mental health evaluation was conducted to determine his competency. However, the Petitioner argues that trial counsel's "failure to pursue any additional investigation outside of competency in a capital case is objectively unreasonable and not within the range of competence demanded of counsel in a capital case." He also contends that if trial counsel had obtained an independent mental health evaluation of him, then he would have been fully informed to make a knowing, voluntary, an intelligent decision to either proceed to trial or to enter a plea of guilt. Moreover, he argues that an independent mental health evaluation would have shown whether he suffered from a mental incapacity that would have prevented the State from seeking the death penalty or would have prevented him from knowingly and voluntarily entering his guilty plea. While the Petitioner acknowledges that he failed to "present testimony from a mental health expert establishing that the legal theory of diminished capacity would have been available to Petitioner at trial[,]" he asks that this court "relax the holding" in Black v. State, which concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990), perm. to appeal denied (Tenn. July 2, 1990).

In response, the State argues that the court properly denied post-conviction relief because the Petitioner failed to prove his allegations of ineffective assistance of counsel. Specifically, the State contends that because the Petitioner did not present evidence of favorable results from a second mental health evaluation at the hearing, he failed to prove that he was prejudiced by his attorneys' decision not to seek an additional mental health evaluation. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover,

-10-

factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901, n.3 (Tenn. 1992)), perm. to appeal denied (Tenn. Nov. 2, 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S.

at 688, 104 S. Ct. at 2065; <u>Baxter</u>, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068). In order to satisfy the "prejudice" requirement in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); <u>see also</u> <u>Serrano v. State</u>, 133 S.W.3d 599, 605 (Tenn. 2004).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>State v. Burns</u>, 6 S.W.3d 453, 462 (Tenn. 1999) (citing <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct. at 2065). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." <u>Strickland,</u> 466 U.S. at 688-89, 104 S. Ct. at 2065.

First, the Petitioner specifically contends that his trial attorneys were ineffective in failing to present expert, psychiatric testimony showing that he was unable to form the requisite culpable mental state for the charged offenses. In <u>Black v. State</u> this court concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." 794 S.W.2d at 757. Although the Petitioner asks that we relax the holding in <u>Black</u>, we decline to do so because the presentation of the witness at the evidentiary hearing serves the important purpose of allowing the post-conviction court and this court to determine whether the Petitioner suffered prejudice by trial counsels' actions. The presentation of the witness at the post-conviction hearing is the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case,
> (b) a known witness was not interviewed,
> (c) the failure to discover or interview a witness inured to his prejudice, or
> (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Although the Petitioner claims that trial counsel rendered ineffective assistance in failing to present testimony from an independent mental health expert, we note that the Petitioner failed to present any favorable expert psychiatric testimony that he was prejudiced by trial counsels' actions. See id., 794 S.W.2d at 757.

Second, the Petitioner contends that if trial counsel had obtained an independent mental health evaluation of him, then he would have been fully informed to make a knowing, voluntary, an intelligent decision to either proceed to trial or to enter a plea of guilt. He additionally argues that an independent mental health evaluation would have shown whether he suffered from a mental incapacity that would have prevented the State from seeking the death penalty or would have prevented him from knowingly and voluntarily entering his guilty plea. When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242, 89 S. Ct. at 1711. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244, 89 S. Ct. at 1712. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43, 89 S. Ct. at 1712). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligent. Id. These factors include the following:

> [T]he relative intelligence of the defendant;
> the degree of his familiarity with criminal proceedings;
> whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him;
> the extent of advice from counsel and the court concerning the charges against him; and

the reasons for his decision to plead guilty, including a desire to avoid a
greater penalty that might result from a jury trial.

Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

In the trial court's order denying post-conviction relief, it determined that trial counsel had already obtained a mental health evaluation establishing that the Petitioner was competent. The court also found that the Petitioner failed to prove by clear and convincing evidence that trial counsel rendered deficient representation in failing to seek an additional mental health evaluation. Moreover, we note that the Petitioner failed to present any evidence at the post-conviction hearing that an additional mental health evaluation would have provided favorable evidence in his behalf. Accordingly, the Petitioner failed to prove by clear and convincing evidence that trial counsel rendered ineffective assistance of counsel.

The post-conviction court also considered the applicable factors in determining whether the Petitioner entered a knowing and voluntary guilty plea. First, the court found that "[b]ased on Petitioner's ability to read and write, attendance [at] vocational school, and ability to speak English very well, [he had] the relative intelligence to understand and intelligently plead guilty." Second, it found that the Petitioner had multiple opportunities to discuss his available options with counsel during his case. Third, it determined that counsel provided extensive advice, including the fact that the Petitioner did not have to plead guilty, which was admitted by the Petitioner. In addition, counsel explained that he had a right to go to trial and explained the trial process to him. Fourth, it found that "Petitioner had reason to plead guilty because he could have been sentenced to life without the possibility of parole or could have been sentence to death [by lethal injection]." Finally, although the court acknowledged that the Petitioner had "a low degree of experience with criminal proceedings because [he] was a first-time offender, " it determined that the Petitioner gave a voluntary, knowing, and intelligent plea in this case.

Because the evidence does not preponderate against the findings of fact of the post-conviction court, this court is bound by those findings. We conclude that the Petitioner failed to prove by clear and convincing evidence that trial counsel provided ineffective assistance or that his guilty plea was unknowing or involuntary.

**Conclusion.** Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE